

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00698-CV

———————————————————

THE BRIDGE STRATEGY & TECHNOLOGY CONSULTING, LLC, Appellant

V.

JOSH ADAMS, Appellee

On Appeal from County Court at Law No. 3
Tarrant County, Texas
Trial Court No. 2025-005935-3

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

This appeal concerns the arbitrability of a former employee's breach-of-contract and quantum-meruit claims. Appellee Josh Adams sued Appellant The Bridge Strategy & Technology Consulting, LLC for its alleged failure to compensate him with cash- and stock-based commissions. Citing an arbitration clause in Adams's Employment Covenants Agreement, Bridge moved to compel arbitration and to stay the trial court's proceedings. Adams responded that the arbitration clause—which referenced various statutory claims and claims of "improperly or insufficiently paid wages"—did not encompass his claims. The trial court agreed and denied Bridge's motion. Because we conclude that Adams's claims do fall within the arbitration clause, we will reverse and remand.

## I. Background

In July 2024, Adams accepted Bridge's offer to become its Director of Business Development. As part of the offer, Bridge agreed to pay Adams a 4% commission on all invoiced revenue he generated and further agreed to grant him 500 "phantom" stock units "for every $500,000 in contract value executed" over a certain time period.

Bridge terminated Adams's employment in February 2025. Four months later, Adams sued Bridge and three individual officers and directors for breach of contract

and quantum meruit.[1] Adams alleged that Bridge owed him around $243,000 for unpaid cash and stock commissions.

Bridge moved the trial court to order arbitration and to stay its proceedings under the Employment Covenants Agreement that Adams had signed:

> **28. ARBITRATION OF CERTAIN EMPLOYMENT CLAIMS** – You agree that any covered claim, dispute, and/or controversy that You may have against the Company (or its owners, directors, officers, managers, employees or agents) arising from, relating to, or having any relationship or connection whatsoever with: (i) the Fair Labor Standards Act ("FLSA"), the Equal Pay Act ("EPA") or any state or local wage and hour statute, ordinance, or regulation, or any other claim or cause of action alleging You were improperly or insufficiently paid wages, (ii) the Employee Retirement Income Security Act of 1974 ("ERISA"); and/or (iii) the Fair Credit Reporting Act ("FCRA"), shall be submitted exclusively to and determined exclusively by binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. . . .

In response, Adams drew the trial court's attention to the clause's statutory references and the undefined term "wages" and argued that the arbitration agreement did not cover his claims about unpaid "cash or stock commissions." The trial court conducted a hearing, agreed with Adams's contract construction, and denied Bridge's motion.

## II. Discussion

Bridge raises two interrelated appellate issues, asserting that the trial court erred by not compelling arbitration and staying the trial proceedings. We agree.

---

[1]He alleged that because Bridge's corporate privileges and registration had been forfeited, the three individuals were liable for Bridge's debts.

## A. Standard of Review and Applicable Law

We review the denial of a motion to compel arbitration for an abuse of discretion, deferring to the trial court's factual determinations if they are supported by evidence but reviewing its legal determinations de novo. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). We review de novo whether the claims in dispute fall within the scope of a valid arbitration agreement. *Id.*

"The Federal Arbitration Act (FAA) generally governs arbitration provisions in contracts involving interstate commerce." *Id.*[2] "Under the FAA, a presumption exists favoring agreements to arbitrate." *Id.* (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001)). The employment agreement at issue generally provides that Georgia law governs, but the agreement's arbitration clause specifically states that arbitration is to be "determined exclusively . . . under the [FAA]." *See id.*

In the broadest terms, "[a] party seeking to compel arbitration . . . must establish (1) the existence of a valid arbitration agreement and (2) that the claims at issue fall within that agreement's scope." *ConocoPhillips Co. v. Graham*, No. 01-11-00503-CV, 2012 WL 1059084, at *2 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet.) (mem. op.) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding)). We construe an arbitration agreement according

---

[2]We have jurisdiction over this accelerated interlocutory appeal under Section 51.016 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.016; *In re Whataburger Rests. LLC*, 645 S.W.3d 188, 190 n.1 (Tex. 2022).

to contract-construction principles. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1745 (2011). Thus, we must ascertain the parties' true intent as expressed by the plain language they used. *See Great Am. Ins. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). In doing so, we must examine the entire agreement to try to harmonize and give effect to all contractual provisions so that none will be meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). We give a contract term its plain and ordinary meaning unless the contract indicates that the parties intended to give it a different meaning. *Reeder v. Wood Cnty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012).

"[W]hen an issue is pending in both arbitration and litigation, the [FAA] generally requires the arbitration to go forward first; arbitration 'should be given priority to the extent it is likely to resolve issues material to [the] lawsuit.'" *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 195 (Tex. 2007) (orig. proceeding) (quoting *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 783 (8th Cir. 2001)); *see* 9 U.S.C. § 3. We review a trial court's ruling on a motion to stay litigation pending an arbitration's outcome for an abuse of discretion. *Kirby v. Stratus Dominion Anesthesia Assocs., PLLC*, No. 02-24-00463-CV, 2025 WL 1006283, at *2–3 (Tex. App.—Fort Worth Apr. 3, 2025, pet. dism'd) (mem. op.).

## B. Analysis

Both of Bridge's appellate issues turn on the issue of whether Adams agreed to arbitrate his claims for unpaid cash and stock commissions. He did.

5

### 1. Georgia Law's Preemption

Before we discuss Bridge's central argument, we first consider a threshold issue that Adams has raised on appeal: whether the arbitration clause is enforceable under Georgia law because he did not initial the arbitration clause when he executed the employment-related agreement. *See* Ga. Code Ann. § 9-9-2(c)(9).[3] Adams cannot prevail on this issue because the parties agreed that binding arbitration would be "determined exclusively . . . under the [FAA]," the FAA preempts Georgia law, and the FAA does not require such initialing. *See* 9 U.S.C. §§ 1–16.

Undisputedly, the arbitration clause at hand states that the parties agreed to submit "certain employment claims" to "binding arbitration under the [FAA]." So the parties agree that federal law—which generally preempts state law—controls. *See AT&T Mobility LLC*, 563 U.S. at 352, 131 S. Ct. at 1753 (holding that state law is preempted when it "stands as an obstacle to the accomplishment and execution of the [FAA's] full purposes and objectives"); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656 (1996) ("Courts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." (emphasis in original)). In line with the numerous state and federal courts in Georgia that have analyzed the same signature issue that Adams raises, we conclude that the FAA

---

[3]Georgia's state arbitration statute expressly conditions enforcing an arbitration clause "relating to terms and conditions of employment" upon the arbitration clause's being "initialed by all signatories at the time of the execution of the agreement." Ga. Code Ann. § 9-9-2(c)(9).

preempts Section 9-9-2(c)(9)'s application to the arbitration clause at hand. *See Davidson v. A.G. Edwards & Sons, Inc.*, 748 S.E.2d 300, 302–03 (Ga. Ct. App. 2013); *Langfitt v. Jackson*, 644 S.E.2d 460, 465 (Ga. Ct. App. 2007); *Halvorson v. Alston & Bird, LLP*, No. 1:23-CV-04881, 2024 WL 5701781, at *2–3 (N.D. Ga. Mar. 13, 2024), *report and recommendation adopted*, No. 1:23-CV-04881, 2024 WL 5701411, at *3 (N.D. Ga. June 13, 2024) ("[T]he [c]ourt concludes that the [Magistrate Judge] properly concluded that this state statutory provision is preempted by the FAA."); *see also In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005) (holding that the FAA preempts the Texas Arbitration Act's signature requirements that apply to personal-injury cases).

## 2. The Arbitration Clause's Scope

Returning to the parties' main point of contention, we consider whether Adams's claims for breach of contract and quantum meruit concerning his alleged unpaid cash and stock commissions fall within the arbitration agreement's scope. *See Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737. To determine the parties' intent, we turn to the language they used and give their terms a plain and ordinary meaning unless the contract indicates that they intended otherwise. *See Great Am. Ins.*, 512 S.W.3d at 893.

Here, the parties did not agree to arbitrate all their disputes or even all their employment disputes. Rather, Paragraph 28's heading indicates that they were agreeing to arbitrate only "certain employment claims."

But what were those certain claims, and did they include Adams's claims for unpaid cash and stock commissions? For ease in analysis, we structurally break down what the parties agreed to arbitrate:

> any covered claim, dispute, and/or controversy that [Adams][4] may have against [Bridge] (or its owners, directors, officers, managers, employees or agents)
>
> arising from, relating to, or having any relationship or connection whatsoever with:
>
> > (i) the [FLSA],
> >
> > the [EPA,]
> >
> > or any state or local wage and hour statute, ordinance, or regulation,
> >
> > or any other claim or cause of action alleging [Adams was] improperly or insufficiently paid wages,
> >
> > (ii) [ERISA]; and/or
> >
> > (iii) the [FCRA.] [Formatting altered.]

In arguing against compelled arbitration, Adams ignores the first two lead-in clauses and homes in on the referenced statutes to argue that he did not file a claim under the FLSA, the EPA, any state or local wage and hour statute, ERISA, or the FCRA. Then, zooming in even closer on the last part of the (i) clause, he argues that

---

[4]The term "You" specifically refers to "Joshua Adams." "Company" means "The Bridge Strategy and Technology Consulting, LLC, and/or any Affiliate Company to which [Adams's] employment relationship may be transferred following the execution of this Agreement or which may otherwise be considered [his] joint or statutory employer."

neither of his legal claims for unpaid cash and stock commissions constitutes a "claim or cause of action alleging [he was] improperly or insufficiently paid wages."

Purportedly quoting the online Merriam-Webster Dictionary's definition, Adams argues that a "'wage' is 'a payment of money for work or services usually calculated on an hourly, daily, or piecework basis,'" and he suggests that commissions, including cash and stock benefits, are not typically calculated on an hourly, daily, or piecework basis. He thus argues that his cash- and stock- commissions claims are not claims for improperly or insufficiently paid wages and are outside the agreement's scope.

Adams's construction argument—although it convinced the trial court to deny Bridge's motion—is legally flawed for at least three reasons. First, he too narrowly construes the term "wages." Second, he fails to recognize the impact of the parties' using the "arising out of" lead-in clause, which broadens the arbitration agreement's scope. And third, he cannot rely on the interpretive tool that the arbitration clause be construed against the drafter—Bridge—because (1) the tool is inapplicable, (2) the agreement forecloses its application and (3) so does the FAA. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189, 139 S. Ct. 1407, 1418–19 (2019); *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011).

### a. Adams construes "wages" too narrowly.

On whether Adams's claims for unpaid cash and stock commissions constitute "wages" under the employment agreement, the agreement itself does not define that

9

term. In such a circumstance, we must discern the common and ordinary meaning, and we may consult dictionaries. *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017) (citing *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011)).

We begin with Merriam-Webster. According to its online dictionary, a "wage" is "a payment *usually* of money for labor or services *usually* according to a contract and on an hourly, daily, or piecework basis." [Emphases added.][5] *See Wage*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/wage. Notably, this definition twice uses the modifier "usually,"[6] and both uses connote that a wage (1) is a payment most often or ordinarily of money that (2) is paid most often or ordinarily under a contract on an hourly, daily, or piecework basis. By the definition's incorporating the term "usually" instead of a nongradable adjective like "always" or "only,"[7] Merriam-Webster does not cabin wage's meaning to being an hourly wage or otherwise exclude from its meaning payment in the form of cash- or

---

[5]In his brief, Adams omits the first "usually" and fails to discuss how both uses of the word affect the definition.

[6]*See Usually*, Merriam-Webster Online Dictionary ("according to the usual or ordinary course of things: most often: as a rule: customarily, ordinarily"), https://www.merriam-webster.com/dictionary/usually.

[7]*See Nongradable Adjectives*, Bryan A. Garner's Modern English Usage 23–24 (5th ed. 2022) (explaining that nongradable adjectives describe absolute states or conditions).

stock-based commissions. *Id.*; *cf.* Bryan A. Garner's Modern English Usage 500 (5th ed. 2022) (stating that "usually always" is an "unconscious oxymoron[]").

In support of this interpretation, we look to Black's Law Dictionary, which contains the following definition of the term "wage": "Payment for labor or services, usu. based on time worked or quantity produced." *Wage*, Black's Law Dictionary (12th ed. 2024). Like Merriam-Webster, Black's Law Dictionary broadly defines "wage" as a "[p]ayment for labor or services" and then modifies that definition with "usually," indicating that the payment is usually but not always or only "based on time worked or quantity produced." *See id.* Importantly, Black's definition further states that "[w]ages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer." *Id.* So Black's descriptive statement recognizes that wages encompass commissions. *Id.*

Adams argues that we should not consult Black's Law Dictionary and should use his misquoted Merriam-Webster definition. But the Texas Supreme Court has itself repeatedly used Black's Law Dictionary when interpreting internally undefined contractual terms, *see, e.g.*, *Skeels v. Suder*, 671 S.W.3d 664, 672 & n.37 (Tex. 2023) (using Black's to discern the plain meaning of a corporate resolution's term); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019) (consulting Black's to ascertain the plain, ordinary, and generally accepted meaning of

11

a contract term), and it has done so when interpreting undefined contractual terms in arbitration disputes, *see, e.g.*, *Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 587 (Tex. 2022); *Loya v. Loya*, 526 S.W.3d 448, 452 (Tex. 2017). Regardless of whether we look to Merriam-Webster alone or along with Black's, the result is the same: the plain, ordinary, and generally accepted meaning of the term "wages" does not exclude but rather includes payment by commissions.

### b. "Arising from, relating to," etc. sweep broadly.

The second flaw in Adams's proffered construction is its failure to examine the entirety of the arbitration clause, including the lead-in phrasing. *See MCI Telecomms. Corp.*, 995 S.W.2d at 652. Adams agreed to arbitrate any claim, dispute, or controversy "arising from, relating to, or having any relationship or connection whatsoever with" the listed claims. This court has previously explained that arbitration provisions with sweeping and expansive phrases—such as "any disputes," "arising from," "relating to," and the like—should be interpreted broadly. *Mid-Am. Apts., L.P. v. Trojan*, No. 02-21-00204-CV, 2021 WL 5028794, at *3–4 (Tex. App.—Fort Worth Oct. 28, 2021, no pet.) (mem. op).

Here, Adams did not plead a cause of action under the FLSA, the EPA, any state or local wage and hour statute, ERISA, or the FCRA. But given that Adams agreed to arbitrate any claims "relating to[] or having any relationship or connection whatsoever with" these statutes, we also consider—in the interest of thoroughness— how they treat commissions and wages:

- The FLSA requires that commissions be included when calculating the "regular rate" of pay for overtime purposes. *See* 29 C.F.R. §§ 778.108, .117.

- Chapter 61 of the Texas Labor Code—governing the prompt payment of wages—specifically includes commissions in it definition of wages: "'Wages' means compensation owed by an employer for . . . labor or services rendered by an employee, whether computed on a time, task, piece, *commission*, or other basis." Tex. Lab. Code Ann. § 61.001(7)(A) (emphasis added).

- Concerning unemployment compensation, the Texas Labor Code states that "'wages' means all remuneration for personal services," including "the cash value of remuneration paid in a medium other than cash[.]" *Id.* § 201.081.

- And while the Texas Minimum Wage Act does not statutorily define "wage," courts have construed the term—using both Black's Law Dictionary and other dictionaries—to mean more than an hourly wage and to include, for example, awarded leave. *See id.* § 62.002 (listing definitions); *Washington v. Assoc. Builders & Conts. of S. Tex. Inc.*, 621 S.W.3d 305, 314–18 (Tex. App.—San Antonio 2021, no pet.) (defining "wage"—as used in the TMWA—to mean "a payment to a person for services rendered" and concluding that the TMWA encompassed and preempted a city ordinance concerning sick and safe leave); *Tex. Ass'n of Bus. v. City of Austin, Tex.*, 565 S.W.3d 425, 439–41 (Tex. App.—Austin 2018, pet. denied) (same concerning paid sick leave).

Because the agreement used expansive, sweeping language tying any claims "relating to[] or having any relationship or connection whatsoever with" these statutes, their statutory definitions of "wages" inform our construction of the arbitration clause. Thus, reading the arbitration clause in its entirety, with its sweeping and expansive lead-in phrases, we conclude that the parties intended for the arbitration clause to cover Adams's dispute over his cash and stock commissions. *See Mid-Am. Apts., L.P.*, 2021 WL 5028794, at *3–4.

**c. The agreement itself negates any contra-the-drafter argument.**

Finally, we address Adams's contention that because Bridge drafted the arbitration agreement, we should construe it against Bridge. We may not, however, rely on the construe-against-the-drafter interpretive tool unless we are construing an ambiguous contract or one that is reasonably susceptible to more than one interpretation. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020). As we have explained above, the term "wages" as used in the parties' arbitration agreement is not ambiguous or reasonably susceptible to more than one interpretation, so we may not use this interpretive tool. *See id.*

But even were we to conclude otherwise—which we do not—the parties expressly agreed in their arbitration agreement that should they dispute the agreement's language, "the fact that one [p]arty drafted the [a]greement shall not be used in its interpretation." Such language not only reflects the parties' intent to not use the construe-against-the-drafter tool but is consistent with the Supreme Court's rejection of it in FAA-governed arbitration disputes: "Although the rule enjoys a place in every hornbook and treatise on contracts, . . . the reach of the canon construing contract language against the drafter must have limits, no matter who the drafter was." *See Lamps Plus, Inc.*, 587 U.S. at 187, 139 S. Ct. at 1417 (citation modified). "[T]he FAA itself provide[s] the rule." *Id.*, 587 U.S. at 189, 139 S. Ct. at 1419. "[C]ourts should resolve any doubts as to the agreement's scope . . . in favor of arbitration." *Ellis*, 337 S.W.3d at 862; *see also Henry*, 551 S.W.3d at 115 ("The

14

presumption in favor of arbitration is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation [that] would cover the dispute at issue." (citation modified)). In sum, for each of these reasons, we reject Adams's assertion that we may construe the agreement against Bridge.

Accordingly, having concluded that the arbitration clause is enforceable and covers Adams's claims, we conclude that the trial court erred by denying Bridge's motion to compel arbitration. We sustain Bridge's first issue.

### 3. Bridge's Stay Request

In its second issue, Bridge contends that because the trial court erred by denying its motion to compel arbitration, the trial court likewise erred by denying its request to stay the trial proceedings. "The FAA requires courts to stay litigation of issues that are subject to arbitration." *Kirby*, 2025 WL 1006283, at *2 (first citing 9 U.S.C. § 3; and then citing *Merrill Lynch Tr. Co.*, 235 S.W.3d at 195). Here, Adams's claims for unpaid cash and stock commissions are subject to arbitration. Accordingly, the trial court erred by not granting Bridge's requested stay. *See id.* We sustain Bridge's second issue.

### III. Conclusion

Having sustained both of Bridge's issues, we reverse the trial court's order denying Bridge's motion to compel arbitration and remand for the trial court to enter an order compelling arbitration and staying all proceedings in the trial court pending

15

the arbitration's completion. *See J.B. Hunt Transp., Inc. v. Lester*, No. 02-23-00035-CV, 2023 WL 3876758, at *9 (Tex. App.—Fort Worth June 8, 2023, no pet.) (mem. op.) (citing *Mid-Am. Apts., L.P.*, 2021 WL 5028794, at *7).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  April 16, 2026